# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# KNOXVILLE DIVISION

**ROCKY WATERS MOTOR INN, LLC,**

    **Plaintiff,**

v.                                                   No: 3:19-cv-00006
                                                            JURY DEMANDED

**THE TRAVELERS INDEMNITY**
**COMPANY OF AMERICA,**                         **Chief District Judge Corker**
                                                            **Magistrate Judge Guyton**

    **Defendant.**

## DEFENDANT'S STATEMENT OF MATERIAL FACTS
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

NOW COMES Defendant, The Travelers Indemnity Company of America, by and through its attorneys, and for its Statement of Material Facts in Support of its Motion for Summary Judgment, states as follows:

**I.**     **The Insurance Policy and Appraisal Provision**

1.     Plaintiff's hotels are insured under Travelers Commercial Property Insurance Policy No. I-660-7396B782-TIA-16 ("Policy"). (See Policy, Dkt. 19, Ex. A).

2.     The Policy provides coverage for direct physical loss of or damage to covered property, subject to all terms, conditions, limitations, and exclusions set forth in the Policy. (See Dkt. 19, Ex. A).

3. The Policy provides as follows regarding appraisal:

**Appraisal**

If we and you disagree on the value of the property or the ***amount of loss***, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and ***impartial*** appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

a. Pay its chosen appraiser; and

b. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we still retain our right to deny the claim.

(See Ex. A, p. 32) (emphasis added).

## II. <u>The Parties Dispute The Cause of Alleged Smoke Damage</u>

4. Although Travelers disagrees with Plaintiff's contentions regarding the cause of loss, Travelers *does* agree that the crux of the parties' dispute is causation. Plaintiff owns two hotels, a Days Inn and the Rocky Waters Motor Lodge. (See Dkt. 29, p. 3).

5. On November 28 and 29, 2016, wildfires produced smoke and soot in the vicinity of Plaintiff's hotels. (See Dkt. 29, p. 3).

6. Plaintiff hired a public adjuster, Chris Cowan of First Call to present its claims to Travelers. (See Deposition of Paul Sutherland, attached hereto as Exhibit "B", pp. 121, line 22 to 122, line 8).

7. Plaintiff executed Proofs of Loss for both properties, stating under penalty of perjury that its loss at the Days Inn totaled $250,588.62 in building damage and $177,894.75 in contents damage, and its loss at the Rocky Waters Motor Inn totaled $137,993.42 in building

damage and $82,943.70 in contents damage. (See Proofs of Loss, attached hereto as Exhibit "C"; See Deposition of Mahavir Patel, p. 44, line 21 to p. 45, line 5, attached hereto as Exhibit "D").

8. After several months of negotiations with First Call, Travelers investigated the loss and paid $299,624.54 to Plaintiff, which included the following amounts less the Policy's $1,000 per building deductible:

- $78,466.06 actual cash value of building damage to the Rocky Waters Motel;
- $24,659.36 replacement cost value for personal property damage to the Rocky Waters Motel;
- $9,619 in business income loss for the Rocky Waters Motel;
- $127,922.44 actual cash value of building damage to Days Inn;
- $43,307.68 replacement cost value for personal property at Days Inn;
- $17,650.00 in business income loss.

(See Affidavit of Paul Sutherland, attached hereto as Exhibit "E").

9. With one minor exception[1], First Call was in agreement with Travelers' loss adjustment and payments. (See Ex. B, pp. 121, line 22 to 122, line 8).

10. Plaintiff, however, fired First Call before the last remaining item of disagreement could be resolved.[2] Plaintiff then hired Chuck Howarth as its "appraiser". (See Dkt. 29, p. 4).

11. Mr. Howarth, not Plaintiff, demanded an appraisal on February 4, 2018. (See Dkt. 30, Ex. 1, para. 3).

---

[1] First Call contended that Travelers also owed 20% overhead and profit even though Plaintiff did not hire a general contractor to perform the cleaning work, doing it all using in-house staff and resources.
[2] Plaintiff's manager, Mahavir Patel, testified to this fact, but Travelers has not received his deposition transcript. Travelers intends to file a supplemental brief containing applicable testimonial excerpts.

12. Howarth's appraisal demand was unlimited in scope, stating merely that plaintiff "has several differences with the settlement offer presented by your company . . . ." (See Dkt. 30, Ex. 2).[3]

13. Howarth's letter did not state whether Plaintiff was seeking appraisal of the remaining items in dispute or was seeking to expand the claim beyond the agreed scope with First Call. (See Dkt. 30, Ex. 2).

14. Howarth also failed to produce an estimate identifying the items in dispute. (See Dkt. 30, Ex. 2).

15. Travelers responded to Howarth on February 19, 2018, writing, "[S]ince we have not been informed of what additional damages you are claiming, we must respectfully decline your request to invoke the policy condition of Appraisal." (See Email, attached hereto as Exhibit "F").

16. Travelers requested, "Please submit your claim for the damages you are claiming. Once we have an opportunity to review your claim documentation then we will respond accordingly." (See Ex. F).

17. On April 26, 2018, Mr. Howarth provided an estimate totaling $1,817,016.01 for replacement of nearly every interior property component.[4] (See Dkt. 19, Ex. E, p. 242, Dkt. 19, Ex. F., pp 320-321; See Email, attached hereto as Exhibit "G").

18. The estimate was based on a scope of damages completed by Forensic Building Sciences ("FBS"), an environmental consultant that Mr. Howarth retained. (See Dkt. 29, pp. 4-5).

19. In the Rocky Waters Motor Inn, FBS collected 13 air samples and six surface samples. (See S & ME Rocky Waters Report, attached as Exhibit "H"; See Dkt. 19, Ex. H).

---

[3] Plaintiff sent a single demand for both the Days Inn and Rocky Waters Motor Inn properties.
[4] This figure results from the combination of Mr. Howarth's Days Inn ($1,222,225.85) and Rocky Waters Motel ($594,790.16) estimates. (See Dkt. 19, Ex. E, p. 242, Ex. F, pp. 320-321).

4

20. Travelers retained Sherman Woodson of S & ME as its environmental consultant. (See Ex H).

21. He is a Certified Industrial Hygienist (CIH) with a M.S. in Public Health, Industrial Hygiene, from the University of South Carolina and a B.S. in Biology. (See Deposition of Woodson, p. 11, lines 8-21, p. 12, lines 2-10, attached as Exhibit "I").

22. He has worked as a CIH for nearly 30 years, performed indoor air quality assessments for multiple school districts, developed air monitoring programs for private companies, and performed exposure assessments for numerous indoor air and surface contaminants. (See Woodson CV, attached as Exhibit "J").

23. According to Mr. Woodson, the FBS test results showed "limited" or "negligible" levels of smoke residue in the majority of samples, with "significant" residue in two rooms with wood burning fireplaces. (See Ex. H).

24. Accordingly, Mr. Woodson concluded that the wildfires did not cause additional smoke or soot damage to the Rocky Waters Motor Inn. (See Ex. H).

25. Rather, the only smoke residue of significance was caused by use of the wood burning fireplaces. (See Ex. H).

26. In the Days Inn, FBS collected 12 air samples and eight surface samples. (See S & ME Days Inn Report, attached hereto as Exhibit "K").

27. The majority of samples had particle counts in the "negligible" and "limited" range. (See Ex. K).

28. One sample tested in the "major" range but came from a wood burning fireplace in one of the rooms. (See Ex. K).

5

29. Accordingly, Mr. Woodson concluded that the wildfires also did not cause additional smoke damage in the Days Inn. (See Ex. K).

30. Rather, the only soot residue of significance was caused by the use of a wood burning fireplace. (See Ex. K).

31. Travelers responded to Howarth's appraisal demand by providing copies of its consultants' reports showing that the remaining alleged damages were not caused by the wildfires. (See Dkt. 19, p. 7).

32. Travelers declined to participate in appraisal, since Howarth was seeking appraisal of the cause of loss. (See Dkt. 19, Exs. M, N).

33. Travelers wrote, "Moreover, your request to appraise the additional claimed damages is rejected. (See *Id.*).

34. Appraisal is not appropriate to determine the existence of damage or causation." (See Dkt. 19, Exs. M, N).

35. In response to a subsequent inquiry regarding appraisal, Travelers wrote, "Appraisal is not appropriate to determine the existence of damage or resolve questions of coverage or causation. As explained in our prior letter, dated August 22, 2018, your request for appraisal is respectfully denied." (See Dkt. 19, Ex. R).

### III. Mr. Howarth's Appraisal Agreement and History of Policyholder Advocacy

36. In this litigation, Mr. Howarth provided a *redacted* copy of an "Appraisal Employment Agreement" ("Appraisal Agreement"). (See Dkt. 19, Ex. D).

37. In the Appraisal Agreement, Mr. Howarth redacted the terms of his compensation. (See Dkt. 19, Ex. D).

38. Paragraph 3 of the Appraisal Agreement reads, "The insured agrees to pay THG in consideration for its services an hourly rate of $," but the details of the fee agreement were redacted. (See Dkt. 19, Ex. D).

39. In another Travelers' claim in which Mr. Howarth is serving as an appraiser, he provided an *unredacted* version of the same form of Appraisal Agreement to Travelers, which read as follows:

> The Insured agrees to pay THG in consideration for its services an hourly rate of $345.00 per hour plus all expenses reasonably incurred in the appraisal. However, because THG has expressed to the Insured the opinion that the amount proposed by the Carrier to the Insured is inadequate, and because THG agrees that a reasonable limitation of the amount of compensation will be necessary for the Insured to realize a benefit from the appraisal, THG agrees that the total hourly fee charged will not exceed thirty percent (30%) of the additional settlement awarded to the Insured going forward, and additionally, *should the process produce no additional settlement then no fee will be due.* If Insured cancels this Agreement prior to the completion of THG's work, then Insured agrees to reimburse THG for its time plus expenses incurred up to the date of cancellation. THG does not make any promise or guarantee that a recovery can or will be obtained.

(See Agreement, attached hereto as Exhibit "L").

40. Plaintiff's manager, Mahavir Patel, confirmed at his deposition that Plaintiff agreed to pay Mr. Howarth on a contingency fee basis between 15% and 30% of the amount recovered in an appraisal. (See Ex. C, p. 42, lines 5-20).

41. Thus, Howarth attempted to conceal this fact by redacting the Appraisal Agreement to make it appear as though his fee was limited to an hourly component. (See Dkt. 19, Ex. E; See Ex. L).

42. Plaintiff's appraiser Mr. Howarth also markets himself as a policyholder advocate who touts his services by reference to his personal "experience" that the vast majority of insurance claims (70%) are underpaid, apparently due to alleged conflicts of interest between insurance

companies and their adjusters and contractors. (See Website Pages, attached hereto as Exhibit "M")

43. The Howarth Group's website contains the following representations:

- Mr. Howarth decided that he would be much happier using the knowledge he gained to help policyholders navigate through the difficult claims process. . . . He, along with Mr. Rowe, has been advocating for policyholders ever since. (See Website Pages, attached hereto as Exhibit M, p. 8).

- Mr. Howarth has also served on the Board of Directors of the National Association of Public Insurance Adjusters (NAPIA) and is past president of both the Tennessee and Florida Association of Public Insurance Adjusters. (See Ex. M, p. 8).

- Three decades of experience enables us to guarantee that if we take on your claim as your Tennessee Public Insurance Adjuster, Kentucky Public Adjuster, Mississippi Public Adjuster, Florida Public Adjuster, Georgia Public Adjuster, or Alabama Insurance Appraiser we will increase your settlement or you owe us nothing. (See Ex. M, p. 3).

- Simply stated: our clients keep 100% of what the insurance company initially offers them and we are compensated on only a small percentage of the additional monies we get for them. (See Website Pages, attached hereto as Exhibit M, p. 3).

- The Howarth Group has been hired as the insured's appraiser over one thousand (1,000) times over the years and has worked with dozens of excellent umpires who live and work in the Southeast. (See Website Pages, attached hereto as Exhibit M, p. 19).

- [W]e work tirelessly to ensure that you receive the absolute most from your insurance company. (See Website Pages, attached hereto as Exhibit M, p. 24).

- We are public adjusters who work for property owners, not insurance companies. (See Website Pages, attached hereto as Exhibit M, p. 28).

- We Are Here for You. If we determine that your estimate is deficient and you would like to receive the funds you are entitled to, we will happily represent you and your best interests. We take absolutely nothing from the amount you have already been estimated to receive. The Howarth Group receives a percentage of the additional amount we obtain for you as a result of our representation. (See Website Pages, attached hereto as Exhibit M, p. 32).

- If your adjuster assesses your loss fairly then you won't need our help. That's the best thing that could happen with your claim. In our experience this occurs about a third of the time. (See Website Pages, attached hereto as Exhibit M, p. 35).

- First and foremost, understand that many insurance companies' main goal is to settle claims with the least amount of expense possible. Decreasing claims expenses is one way of generating more profits that are then paid out in greater dividends to shareholders. (See Website Pages, attached hereto as Exhibit M, p.40).

- The one thing all insurance companies and adjusters will do is put together an estimate of what they believe it will cost to restore your home to its pre-disaster disaster. Then, and only then, will you have the chance to evaluate the thoroughness of their estimate and determine what their true intentions are. Our experience has shown that only about one-third (30%) of those estimates are sufficient, meaning that two-thirds (70%) of them are not. (See Website Pages, attached hereto as Exhibit M, p. 40).

- [I]t's best to maintain a healthy degree of skepticism when you are looking at losses that could mean hundreds of thousands of dollars to you and to them. Do not assume that the insurance company's loyal employee is going to be able to fairly take into account the interests of both you, his customer and his employer. There's an inherent conflict of interest that is difficult for even the most fair-minded adjusters. (See Website Pages, attached hereto as Exhibit M, p. 43).

- Not only do insurance companies put their own best interests first, they often do not explain to their policyholders that they possess a mutually beneficial relationship with any preferred contractor they might introduce to the homeowner. (See Website Pages, attached hereto as Exhibit M, p. 43).

44. During the entire claim adjustment process, and long after Travelers declined to participate in appraisal, Mr. Howarth effectively acted as a public adjuster for Plaintiff. (See Emails from Howarth, attached hereto as Exhibit "N").

45. He presented an entirely new claim directly to Travelers, pressed Travelers directly for a response to his estimates, and demanded that Travelers contact him with any settlement offers to the insured. (See Ex. N).

IV. **In This Litigation, Plaintiff Relies on Chuck Howarth and Thomas Irmitter to Prove The Scope and Value of Damage**

46. Plaintiff has disclosed three principal experts in this case, Enrique Medina, Chuck Howarth, and Thomas Irmitter.[5] (See Plaintiff's Expert Disclosures, attached hereto as Exhibit "O").

---

[5] Plaintiff also disclosed two experts who conducted laboratory analysis of air and tape samples, but their opinions are not pertinent to this motion.

47. Mr. Medina conducted testing two and a half years after the wildfire, and opines that there are traces of wildfire debris in dust samples taken from attic spaces, maintenance rooms, and wall cavities. (See Medina Reports, attached hereto as Exhibits "P" and "Q").

48. According to Mr. Medina, wildfire debris consists of elevated levels of char and low levels of soot. (See Medina Deposition, p. 47, line 20 to p. 48, line 3, attached hereto as Exhibit "R").

49. According to Mr. Medina, wildfires produce char, not soot, because wildfires burn at higher temperatures than other forms of combustion. (See *Id.*).

50. Mr. Medina has no opinion regarding the proper means and methods to remediate the trace amounts of wildfire debris he claims to have identified. (See Ex. R, p. 109, lines 9-13).

51. Mr. Medina has no opinion on whether the amount of wildfire debris poses any health risk to building occupants and admitted that there are no studies or research establishing any danger to human health from residual wildfire debris. (See Ex. R, p. 38, line 9 to p. 39, line 6).

52. Plaintiff bases its calculation of damages on Mr. Howarth's estimate. (See Ex. O).

53. Mr. Howarth based the scope of his estimate on recommendations of Thomas Irmitter. (See Deposition of Chuck Howarth, p. 100, lines 14-24).

54. Mr. Irmitter bases his recommendations regarding the scope of remediation on his assertion that **soot** has carcinogenic properties. (See Irmitter Reports, attached as Exhibits "S" and "T").

55. In his reports, he writes as follows:

> Soot is a general term that refers to the black, impure carbon particles resulting from the incomplete combustion of a hydrocarbon. It is more properly restricted to the product of the gas-phase combustion process but is commonly extended to include the residual pyrolyzed fuel particles such as cenospheres, charred wood,

petroleum coke, etc. that may become airborne during pyrolysis and which are more properly identified as cokes or chars. The gas-phase soots contain polycyclic aromatic hydrocarbons (PAHs). The PAHs in soot are known mutagens and probable human carcinogens. Soot is in the general category of airborne particulate matter, and as such is considered hazardous to the lungs and general health. Soot is classified as a "Known Human Carcinogen" by the International Agency for Research on Cancer (IARC).

(See Exs. S and T).

56. Mr. Irmitter has no training, background, or experience in chemistry, thermodynamics, medicine, or toxicology. (See CV, attached as Exhibit "U").

57. Mr. Irmitter holds a B.A. in English with emphasis in creative writing but has no degrees in a scientific field. (See Ex. U).

/s/ Brian E. Devilling
Matthew S. Ponzi
Brian E. Devilling
FORAN GLENNON PALANDECH PONZI
& RUDLOFF PC
222 North LaSalle Street
14th Floor
Chicago, Illinois 60601
(312) 863-5000
mponzi@fgppr.com
bdevilling@fgppr.com

Douglas R. Bergeron
Clint J. Woodfin
SPICER RUDSTROM, PLLC
800 South Gay Street, Suite 1400
Knoxville TN 37929
dbergeron@spicerfirm.com
cwoodfin@spicerfirm.com

## CERTIFICATE OF SERVICE

      I hereby certify that the appended document was filed electronically with the above-captioned court on February 28, 2020, with notice of case activity to be generated and sent electronically by the Clerk of said court to all attorneys of record.

                                                      */s/ Brian E. Devilling*