IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

**ROCKY WATERS MOTOR INN, LLC,**

    **Plaintiff,**

v.                                    No: 3:19-cv-00006
                                     JURY DEMANDED

**THE TRAVELERS INDEMNITY
COMPANY OF AMERICA,**               Chief District Judge Corker
                                           Magistrate Judge Guyton
    **Defendant.**

## DEFENDANT'S MOTION TO BAR EXPERT OPINIONS OF THOMAS IRMITER AND CHUCK HOWARTH

NOW COMES Defendant, The Travelers Indemnity Company, by and through its attorneys, and for its Motion in Limine to Bar the Expert Opinions of Thomas Irmiter and Chuck Howarth, states as follows:

### I. Introduction

This matter involves an insurance coverage dispute regarding alleged smoke damage to Plaintiff's two hotels caused by the November, 2016 Gatlinburg wildfires. Plaintiff has disclosed Chuck Howarth as its damages expert. Mr. Howarth completed an estimate totaling $1,817,016.01 for replacement and cleaning of numerous interior property components at the hotels.

Mr. Howarth did not perform any scientific analysis to determine the presence or extent of wildfire debris. Instead, he relied on a report from Thomas Irmiter, a building consultant from Minnesota, who opined that all soot must be removed from wall cavities and attic spaces because

it is carcinogenic. Mr. Irmitter's report contains a scope of work designed to achieve the eradication of all alleged wildfire "soot".

However, Mr. Irmitter is not qualified to assess wildfire debris, determine the scope of necessary remediation, or render opinions regarding carcinogenic properties of debris. He lacks any training, background, or experience in medicine, toxicology, or chemistry, and admitted at deposition that he has no basis to opine whether the debris allegedly remaining in Plaintiff's hotels poses any health risk to occupants. Moreover, Mr. Irmitter's remediation recommendations are based on the purported need to remove carcinogenic **soot** residue, but Mr. Irmitter and all expert witnesses in this case have testified that **char, not soot** is a byproduct of wildfires. Accordingly, Mr. Irmiter's opinions must be barred. Since Mr. Howarth's relied on an inadmissible opinion regarding remediation scope, his estimate and valuation opinions must be barred as well.

In addition, Mr. Howarth's damages valuation is based on replacement cost new ("RCV"). He did not disclose any opinions or calculations regarding the actual cash value ("ACV") of the repairs. As the Travelers insurance policy limits recovery to ACV under these circumstances, Mr. Howarth's valuation is based on the incorrect measurement of the loss.

## II. Background

Plaintiff owns two hotels, a Days Inn and an independent hotel known as the Rocky Waters Motor Inn. (See Dkt. 29, p. 3). At the time of the Gatlinburg wildfires ("wildfires"), these properties were insured by Travelers under a first-party commercial property policy ("policy"). (See Policy, attached hereto as Exhibit "A"). Following the fires Plaintiff hired a public adjuster and submitted claims to Travelers for smoke damage to the properties from the wildfires. (See

Deposition of Paul Sutherland, attached hereto as Exhibit "B", pp. 121, line 22 to 122, line 8). Travelers investigated the claims and paid Plaintiff $299,624.54 , which included the following amounts less the Policy's $1,000 per building deductible:

- $78,466.06 actual cash value of building damage to the Rocky Waters Motel;

- $24,659.36 replacement cost value for personal property damage to the Rocky Waters Motel;

- $9,619 in business income loss for the Rocky Waters Motel;

- $127,922.44 actual cash value of building damage to Days Inn;

- $43,307.68 replacement cost value for personal property at Days Inn;

- $17,650.00 in business income loss.

(See Affidavit of Paul Sutherland, attached hereto as Exhibit "C").

Not satisfied with these payments, Plaintiff fired its public adjuster and demanded appraisal of the loss under the policy, retaining Chuck Howarth to serve as its appraiser.[1] (See Deposition of Mahavir Patel, p. 40, line 15 to p. 41, line 6; p. 50, line 25 to p. 51, line 7, attached hereto as Exhibit "D"). Mr. Howarth, in turn, engaged Mr. Irmiter to obtain debris samples from the properties ostensibly for the purpose of determining a proper protocol for smoke damage remediation. (See Deposition of Thomas Irmiter, p. 24, lines 10-11, attached hereto as Exhibit "E"; See Reports of Thomas Irmiter, attached hereto as Exhibits "F" and "G"). Mr. Irmiter's associate collected tape and air samples from attics, wall cavities, and fireplaces. (See Exs. F and G).

---

[1] As discussed in Defendant's Motion for Summary Judgment, appraisal is a contractual alternative dispute process to determine the "amount of loss." Since appraisal may not be used to determine coverage or causation, appraisal was not proper in this case.

Mr. Irmitter then sent the samples to a third-party laboratory, N.G. Carlson Analytical, for analysis. (See Exs. F and G). The testing was to identify levels of char and soot in each sample. (See Exs. F and G). When material combusts, char, soot and ash are produced at different stages in the combustion process. (See Ex. E, p. 46, line 22 to p. 48, line 16;See Deposition of Enrique Medina, p. 46 line 9 to p. 47, line 9, attached hereto as Exhibit "H"). Char is the byproduct of the earliest stage of combustion, followed by soot, followed by ash, which is the byproduct of complete combustion. (See Ex. E, p. 46, line 22 to p. 48, line 16).

All experts in this case agree that wildfires produce elevated levels of *char* and minimal levels of *soot*. (See Ex. E, p. 40, lines 18-19). Mr. Irmiter testified that "wildfire is typically going to throw out char," that char is "most determinative of a wildfire," and that char is "typically what we see the most in a wildfire." (See Ex. E, p. 40, lines 18-19; p. 48, lines 20 to 24). Mr. Irmitter added, "There's just a lot more char than there is any of the soot kinds of things. It's also -- depending on when you're looking, it's also really hard to find the soot in a wildfire." (See Ex. E, p. 49 lines 3 to 7). Plaintiff's industrial hygienist expert, Enrique Medina, testified that the wildfire at issue deposited char in the properties at issue. (See Ex. H, p. 119, lines 9 to 17). According to Mr. Medina, wildfires produce "minimal" levels of soot. (See Ex. H, p. 47, lines 20-23; p. 132, lines 21 to 23).

Mr. Irmiter's samples showed varying levels of solid-phase char and soot according to the location of the sample. (See Exs. F and G). Notably, the only areas showing elevated levels of soot were samples taken from wood burning fireplaces in three hotel rooms. (See Exs. F and G).

None of Plaintiff's experts have opined that the mere presence of wildfire char and soot has caused or will cause any physical damage to the buildings' structures. (See Ex. E, p. 80, line

11 to p. 81, line 8; See Ex. H, p. 107, line 22 to p. 108, line 2). Mr. Medina had no opinion on whether the presence of wildfire debris has caused damage, and offered no opinion on the necessary method or scope of remediation. (See Ex. H, p. 83, lines 11-14; p. 107, line 22 to p. 108, line 2). He conceded that there are "currently no recognized standards or generally accepted consensus documents that numerically quantify and establish minimum threshold concentrations of char or other wildlife residue particles to determine the impact to a property." (See Ex. H, p. 32, lines 7 to 32). Mr. Irmitter likewise testified that he is unaware of the wildfire debris causing any damage to or alteration of the structure.[2] (See Ex. E, p. 80, line 11 to p. 81, line 8).

Rather, Mr. Irmitter recommends removing all debris, even that which is trapped in wall cavities and attic spaces, because **soot** is a known carcinogen. (See Exs. F and G). Mr. Irmitter opines, "[I]t is my opinion that the brush fire caused damage to the building through the deposition of carcinogenic soot into the entire attic, the CMU block walls, suspended ceiling spaces and ducts." (See Exs. F and G). He adds:

> Soot is a general term that refers to the black, impure carbon particles resulting from the incomplete combustion of a hydrocarbon. It is more properly restricted to the product of the gas-phase combustion process but is commonly extended to include the residual pyrolyzed fuel particles such as cenospheres, charred wood, petroleum coke, etc. that may become airborne during pyrolysis and which are more properly identified as cokes or chars. The gas-phase soots contain polycyclic aromatic hydrocarbons (PAHs). The PAHs in soot are known mutagens and probable human carcinogens. Soot is in the general category of airborne particulate matter, and as such is considered hazardous to the lungs and general health. Soot is classified as a "Known Human Carcinogen" by the International Agency for Research on Cancer (IARC).

(See Exs. F and G).

---

[2] He added that he has seen instances in which smoke debris caused electrical conduits to degrade, but he is unaware of ny evidence of such degradation in this case. (See id.)

Moreover, Mr. Irmiter opines that gas-phase soots are carcinogenic, but admits that this occurs only during combustion. He testified as follows:

> Q. What is the gas-phase combustion process?
>
> A. Burning. It's called the burning process. That's where you're going to see -- that's the smoke that's coming out.
>
> Q. The wildfire debris that's there now, is that in the gas-phase combustion process?
>
> A. No.

(See Ex. E, p. 111, lines 11 to 17).

Mr. Irmitter has consulted as an expert in cases involving building envelope, water intrusion, and mold issues. He was once a licensed contractor, but his license was revoked by a consent decree after the State of Minnesota accused him of engaging in fraudulent and deceptive practices. (See Ex. E, p. 14, line 15 to p. 16, line 24; See Hoppersted Order, acttached hereto as Exhibit "I"). He is not a certified industrial hygienist, toxicologist, engineer, or chemist and has no medical training. (See Ex. E, p. 6, line 24 to p. 8, line 24). Although he labels his business Forensic Building *Sciences*, he has admitted that he has no background in science. (See Deposition of Thomas Irmiter, *Wilshire Manor Apartments v. State Farm Ins. Co,* p. 11, attached hereto as Exhibit "J"). His only degree is in English with an emphasis in creative writing. (See Ex. E, p. 6, lines 11 to 21). He has never been accepted by a court as an expert in a wildfire case. (See Ex. E, p. 39, line 23 to p. 40, line 2). When asked if the wildfire debris at issue presents any health risk to building occupants, he testified, I'm not qualified to give that opinion. . . . I typically don't disqualify myself, but I'm not a medical doctor." (See Ex. E. p. 123, line 24 to p. 124, line 6). Likewise, he could identify no peer-reviewed studies or publications correlating particular levels of wildfire debris to health risks in humans. (See Ex. E, p. 64, line 23 to 65, line 6). Multiple courts have barred Mr. Irmiter's opinions. See e.g. *Hoppersted v. Souther*

*Minnesota Multi-County Housing & Redevelopment Authority*, Case No. C5-04-739 (Dist. Ct., Goodhue County, Minn, Aug. 2m 2006) (barring Mr. Irmiter's opinion because he "holds no engineering degree and is not currently a licensed contractor" and his contractor's license was revoked due to allegations of "numerous fraudulent, deceptive, or dishonest practices."); *Church v. Church Mut. Ins. Co.*, No. 13 C 1625, 2016 WL 772787, at *3 (N.D. Ill. Feb. 29, 2016) (Mr. Irmitter's causation opinions in windstorm case barred under F.R.E. 702 because he lacked requisite bases or qualifications)

### III. Argument

Federal Rule of Evidence 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 (2020).

Mr. Irmiter's opinions are inadmissible on multiple grounds. He lacks qualifications to testify as to carcinogenic properties of any debris. (See Ex. E, p. 6, line 11 to p. 8; p. 39, line 23 to p. 40, line 2; p. 123, line 24 to p. 124, line 6, line 24; See Ex. J). He bases his remediation recommendations on carcinogenic properties of *soot*, even though wildfires produce *char, not soot*. (See Ex. E, p. p. 40, lines 18-19; p. 48, lines 20 to 24; p. 49, lines3 to 7; See Exs. F and G; See Ex. H, p. 47, lines 20-23; p. 132, lines 21 to 23). He also admits that it is only the *gas-phase* of soot that is carcinogenic, and all debris at issue is in its solid-phase. (See Exs. F and G). Since

Mr. Irmitter's opinions are inadmissible, Mr. Howarth's estimate of damages is likewise inadmissible, since it is based on Mr. Irmiter's recommendations.

### A. Mr. Irmiter is Not Qualified to Render Opinions Regarding Carcinogenic Properties of Wildfire Debris

To render an expert opinion, Rule 702 requires that an expert is qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702(a) (2020). By his own admission, Mr. Irmiter lacks any scientific training. (See Ex. J, p. 11). He is not a toxicologist, medical doctor, or chemist. (See Ex. E, p. 6, line 24 to p. 8, line 24). He admitted that he has no idea whether the wildfire debris poses any actual health threat to occupants of the motels, and he could identify no sources, peer-reviewed or otherwise, correlating wildfire residue levels to human health risks. (See Ex. E. p. 64, line 23 to 65, line 6; p. 123, line 24 to p. 124, line 6). Thus, he is not only unqualified to render such opinions, but he freely admits that there is no basis for his opinions.

This court has barred even medical doctors from testifying regarding toxicological causation issues when they lack specific training or experience determining medical causation. For example, in *Wynacht v. Beckman Instruments, Inc.*, 113 F. Supp. 2d 1205, 1209 (E.D. Tenn. 2000), a clinical physician opined that the plaintiff's medical conditions were caused by exposure to chemicals in a lab where she worked. The court distinguished between medical causation and clinical diagnosis, holding that the physician was qualified merely to render medical diagnoses, but not to establish a causal link between the chemical exposure and the plaintiff's medical conditions. *Id.*

Under this standard, Mr. Irmiter is certainly unqualified to opine that wildfire residue must be removed due to its alleged carcinogenic properties. *Wynacht* applied a high standard, requiring a witness to have specific training to determine medical causation beyond the mere

ability to clinically diagnose a patient's condition. Mr. Irmiter, lacking any toxicological, medical, or scientific training, falls monumentally short of this standard.

Since Mr. Howarth bases his estimate on Mr. Irmiter's recommended scope of remediation (See Howarth Deposition, p. 98, line 15 to p. 100, line 24, attached hereto as Exhibit "K"), Mr. Howarth's estimate must be barred as well. Rule 702 permits experts to rely on otherwise inadmissible hearsay. This is, however, a very limited exception to the hearsay rule. *Engebretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721, 728 (6th Cir. 1994). An expert may not base his or her own opinion on unreliable studies or opinions of third-parties. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 145, 118 S. Ct. 512, 518, 139 L. Ed. 2d 508 (1997) (excluding expert opinion based on unreliable toxicological studies of animals). See also 29 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure: Evidence § 6272 (1997) ("[B]ecause Rule 703 permits expert testimony to be based on inadmissible evidence, the provision necessarily must concern itself with the reliability of that testimony.... An expert opinion based on inadmissible evidence such as hearsay can pose the same sorts of reliability problems as the inadmissible evidence on which it is based."). In the context of insurance coverage, an estimate is inadmissible if it "does not identify on what information it was based and it does not tie the repairs to damage covered under the insurance policy. *Baker v. Country Cas. Ins. Co.*, No. 2:12-CV-3695-AKK, 2014 WL 12617725, at *2 (N.D. Ala. July 18, 2014) (citing *Matthews v. State Farm Fire and Casualty Co.*, 500 Fed. Appx. 836, 841 (11th Cir. Dec. 6, 2012).

Mr. Howarth conducted no testing of his own to determine the presence, extent, or health risk of the alleged wildfire debris, but always relies on third-parties to do such testing. (See Ex. K, p. 65, line 23, to p. 65, line 11). At the time he generated his estimate, the only individual to conduct any such testing was Mr. Irmitter. (See Exs. F and G). Thus, Mr. Howarth has no other

basis for the scope of his estimate other than Mr. Irmiter's flawed opinion. Therefore, Mr. Howarth's estimate must be barred.

### B. Mr. Irmiter's Opinion Is Not Based on Reliable Principles and Methods

Mr. Irmiter's opinion fails not only because he in unqualified, but also because he employed no reliable, let alone identifiable, method to conclude that all alleged wildfire residue must be removed. In assessing the reliability of expert testimony, a court must examine four factors: (1) whether the concept has been tested; (2) whether the concept has been subjected to peer review; (3) whether the concept has a known rate of error; and (4) whether the concept is generally accepted by the relevant community. *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Mr. Irmiter should be disqualified from testifying as an expert on several different grounds. First, he possesses no qualifications to develop remediation protocols for wildfire debris. Second, not only is he unqualified, but his admission that wildfires do not produce soot undermines his opinion that carcinogenic soot is related to the wildfire and requires extensive remediation. Third, his methodology is unreliable. Mr. Irmiter's opinions fail to satisfy a single factor of the *Daubert* test.

#### 1. Mr. Irmitter's Opinions Have Not Been Tested

Mr. Irmiter opines that all wildfire debris must be removed from the premises due to carcinogenic properties of soot. (See Exs. F and G). However, he admits that there are no tests or studies linking particular levels of wildfire debris to adverse health effects. (See Ex. E, p. 64, line 23 to 65, line 6). Plaintiff's industrial hygienist expert, Mr. Medina, also admitted that there are no studies linking wildfire residue to adverse health effects. (See Ex. H, p. 38, line 22 to p. 39, line 19).

### 2. Mr. Irmiter's Methods and Opinions Have Not Been Subjected to Peer Review

Likewise, Mr. Irmiter's opinions have not been subjected to peer review. He admitted there is no peer-reviewed literature supporting his opinion that microscopic wildfire residue must be removed due to potential health risks. (See Ex. E, p. 64, line 23 to 65, line 6).

Moreover, Mr. Irmiter developed his own methods to identify wildfire debris in conjunction with his laboratory technician of choice, Neil Carlson of N.G. Carlson Analytical. However, Mr. Carlson admitted that he has never received outside training regarding microscopic analysis and recognition of wildfire debris, but is self-taught. (See Ex. K, p. 31, lines 18 to 23). Mr. Carlson and Mr. Irmiter taught themselves to analyze debris by buying wood products, burning them, and looking at them under a microscope. (See Ex. K, p. 30, line 12 to p. 31, line 17). Mr. Carlson could cite no peer-reviewed sources guiding his visual identification of microscopic debris. (See Ex. K, p. 41, lines 14 to 18). Accordingly, Mr. Irmiter's opinions fail the second prong of the *Daubert* test as well.

### 3. There Is No General Acceptance of Mr. Irmiter's Opinions

Absent any peer reviewed literature or studies linking particular levels of wildfire debris to adverse health effects, Mr. Irmiter cannot establish any general acceptance of the methods or bases of his opinion.

### 4. Absent Testing, Peer-Reviewed Support, or General Acceptance, Mr. Irmiter's Opinion Must Be Barred

Courts have established a high bar for admission of toxicological testimony. A witness must not only be qualified to render such an opinion (which Mr. Irmitter is not), but must also have a basis to link health risks to exposure levels. For example, in *Nelson v. Tennessee Gas Pipeline Co.*, No. 95-1112, 1998 WL 1297690, at *3 (W.D. Tenn. Aug. 31, 1998), aff'd, 243

F.3d 244 (6th Cir. 2001) (applying Tennessee law), a medical doctor who served as the Director of the University of Southern California Environmental Sciences Lab opined that PCB exposure caused depression and other health issues in a group of plaintiffs. However, he had no information regarding each plaintiff's level of exposure, and could identify no peer-reviewed literature linking PCB exposure to many of the health issues the plaintiffs experienced. *Id.* at *6. The court barred the expert's opinion, holding, "An appropriate methodology requires evidence from which the trier of fact could conclude that the plaintiff was exposed to levels of toxin sufficient to cause the harm complained of." *Id.*

In this case, Mr. Irmiter not only lacks qualifications to render toxicological opinions, but he neither employed nor relied upon any method to determine whether wildfire residue levels warrant removal for heath reasons. To the contrary, he has no information regarding likely occupant exposure to wildfire debris and admits that there are no studies correlating particular exposure levels to adverse health effects. Under Rule 702 and *Nelson,* Mr. Irmiter's opinion must be excluded.

### C. Mr. Irmiter Failed to Reliably Apply Principles and Methods to The Facts of This Case

#### 1. Mr. Irmiter Identifies "Soot" As The Carcinogenic Debris That Must Be Removed

Mr. Irmiter writes in his report that the wildfire deposited "carcinogenic soot" into the attics and wall cavities at the hotels. (See Exs. F and G). However, he admits that wildfires produce char, not soot, and he has not opined that char poses similar health risks warranting remediation. (See Ex. E, See Ex. E, p. 40, lines 18-19; p. 48, lines 20 to 24; See Exs. F and G). Plaintiff's certified industrial hygienist expert, Mr. Medina, concurs on this issue. He testified unequivocally that wildfires produce minimal soot, and elevated levels of char. (See Ex. H, p. 47,

lines 20-23; p. 132, lines 21 to 23). Moreover, the only air or surface samples showing elevated levels of soot came from wood-burning fireplaces. (See Exs. F and G). Thus, even if the court were to accept Mr. Irmiter's opinion that even microscopic levels of soot must be removed from attics and wall cavities, the opinion is misplaced in this case, since wildfires produce char, not soot, and the only evidence of soot residue came from wood burning fireplaces.

      2.      **Only Gas-Phase Soot Is Carcinogenic**

Mr. Irmiter's opinion also fails because it is based on carcinogenic properties of **gas-phase** soot. (See Exs. F and G). Mr. Irmiter bases his opinions on an excerpt from the National Institutes of Health, Report on Carcinogens, 14th Edition. (See Exs. F and G). As Mr. Irmiter concedes in his report, soot is carcinogenic only when it is in its gas phase. (See Exs. F and G). Quoting the NIH Report, he writes, "The gas-phase soots contain polycyclic aromatic hydrocarbons (PAHs). The PAHs in soot are known mutagens and probable human carcinogens." (See Exs. F and G).

However, gas-phase soot is present only during the combustion process. See Ex. E, p. 111, lines 11 to 17). Mr. Irmiter concedes that the residue at issue is in its solid phase. See Ex. E, p. 111, lines 11 to 17). Thus, there is no risk from carcinogenic polycyclic aromatic hydrocarbons, as outlined in the NIH Report. Even if the court looks past Mr. Irmiter's lack of qualifications and past the fact that wildfires do not produce soot, his opinion is still inadmissible. The carcinogenic properties of **gas-phase** soot are irrelevant, since there is only solid-phase residue left at the properties.

      D.      **Neither Mr. Irmiter's nor Mr. Howarth's Opinions Are Helpful to The Trier of Fact**

Rule 702 also requires that an expert opinion be helpful to the trier of fact. As the Supreme Court held in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591, 113 S. Ct. 2786, 2795, 125 L. Ed. 2d 469 (1993), "Rule 702 further requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue.' This condition goes primarily to relevance. Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."  The Court added, "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 591–92.

Even if Mr. Irmiter were qualified to opine on the carcinogenic properties of soot, the opinion is irrelevant. Mr. Irmiter and all experts in this case opine that **soot is not a wildfire byproduct**. Thus, even if it is carcinogenic, it bears no causal relevance to this case. Absent competent expert testimony that the soot at issue is a wildfire byproduct, the presence of soot is immaterial and of no assistance to a trier of fact in determining whether remaining trace amounts of wildfire debris must be removed from wall cavities and attic spaces. Likewise, the fact that gas-phase soot is carcinogenic is irrelevant and unhelpful to the trier of fact, since the residue at issue is in its solid phase.

The inadmissibility of Mr. Irmitter's opinion renders Mr. Howarth's estimate irrelevant and unhelpful to the trier of fact as well. Mr. Howarth relied on Mr. Irmiter's recommended scope of remediation in generating his estimate. (See Howarth Deposition, p. 98, line 15 to p. 100, line 24, attached hereto as Exhibit "K"). In particular, Mr. Howarth relied on Mr. Irmiter's conclusion that the wildfire deposited carcinogenic soot in the wall cavities and attic spaces at the properties. (See *id;* See Exs. F and G). Since Mr. Howarth's estimate is based on an unreliable and inadmissible opinion, the estimate must be excluded.

Put another way, Mr. Howarth's estimate will not assist the trier of fact in determining anything at issue. His estimate reflects his opinion on the cost to remove all **soot** debris, regardless of whether it was caused by the wildfire or any other covered cause of loss. As discussed above, "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591, 113 S. Ct. 2786, 2795, 125 L. Ed. 2d 469 (1993). The cost of removing all soot from the hotels is irrelevant, absent admissible expert testimony that the wildfire caused the soot, which it did not.

### E. Mr. Howarth's Estimate is Based on Replacement Cost Value

Mr. Howarth's estimate must also be excluded because it is based on replacement cost value. (See Ex. K, p. 104, lines 3 to 11). Under the Policy, an insured is entitled to coverage on an actual cash value basis if they do not repair the property within a reasonable time after a loss. (See Ex. A p.37). Here, Plaintiff has performed none of the work set forth in Mr. Howarth's estimate. The only work Plaintiff has performed to date was to have its staff perform ordinary housekeeping cleaning on rooms, lobbies, and hallways at a cost of approximately $20,000 in labor. (See Ex. C, p. 25, lines 3 to 23). Since Mr. Howarth's estimate uses the wrong standard of valuation, it is irrelevant and must be excluded.

### F. Mr. Howarth's Estimate Is Inadmissible under Federal Rule of Evidence 403

Federal Rule of Evidence 403 requires exclusion of evidence if its probative value is substantially outweighed by the danger of unfair prejudice or confusion. As discussed above, Mr. Howarth's estimate reflects the cost to remediate soot damage unrelated to the wildfire. Absent expert testimony establishing a causal link between the wildfire at issue and the allegedly carcinogenic soot, admitting Mr. Howarth's estimate would be unfairly prejudicial to Travelers

and cause confusion among jurors. Moreover, Mr. Howarth's use of the incorrect valuation standard further increases the danger of unfair prejudice and confusion of issues. Thus, even if the Howarth estimate has minimal probative value, it must still be excluded under Federal Rule of Evidence 403.

## V. Conclusion

For the reasons set forth above, Travelers requests that this Court grant its Motion to Bar Testimony of Thomas Irmiter and Chuck Howarth.

/s/ Brian E. Devilling
MATTHEW S. PONZI
BRIAN E. DEVILLING
FORAN GLENNON PALANDECH PONZI
& RUDLOFF PC
222 North LaSalle Street
14th Floor
Chicago, Illinois 60601
(312) 863-5000

## PROOF OF SERVICE

The undersigned does hereby swear and affirm that he served a copy of the foregoing document on all counsel of record on this 12th day of March, 2020.

/s/ Brian E. Devilling
